## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SYLVESTER CORNISH** | **CIVIL ACTION** |
| **VERSUS** | **NO:    12-2746** |
| **COMMISSIONER OF SOCIAL**<br>**SOCIAL SECURITY ADMINISTRATION** | **SECTION: "G" (4)** |

## REPORT AND RECOMMENDATION

### I.    Introduction

This is an action for judicial review of a final decision of the Commissioner of Social Security pursuant to Title 42 U.S.C. § 405(g).[1]  The Commissioner denied Sylvester Cornish's claim for Disability Benefits and Supplemental Security Income Benefits under Title XVI of the Social Security Act, Title 42 U.S.C. § 1382c.

The matter was referred to the undersigned United States Magistrate Judge pursuant to Title 28 United States Code § 636(b) for the submission of Proposed Findings and Recommendations.

### II.    Factual and Procedural Summary

Cornish is currently a 41-year-old man with a 10th grade education, who has been

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 24(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence section 205(g) of the Social Security Act. 42 U.S.C. §405(g).

unemployed since 2009.  (R. Doc. 14-6.).[2]  Cornish first filed for disability benefits with the Social Security Administration on January 8, 2010 alleging that his disability began on October 1, 2008. (R. Doc. 14-5, p. 99, 14-6, Tr.120.)  He alleges that he is disabled and unable to work because he has difficulty thinking and suffers from depression.  (R. Doc. 14-6, Tr. 124.)

On August 24, 2010, the Social Security Administration ("SSA") found that Cornish was not disabled and denied the claim because he failed to submit a work history report ("3369 form"). The SSA also denied his claim because it found that he could perform other work.  (R. Doc. 14-3, Tr. 50.)  On October 16, 2010 he filed a request for a hearing with an Administrative Law Judge ("ALJ") in the Social Security Administration's Office of Hearings and Appeals.  (R. Doc. 14-2, Tr. 8.)

On  June 1, 2011, Administrative Law Judge Benita A. Lobo ("ALJ") conducted a hearing in which she reviewed the SSA's decision to deny Cornish's application for disability benefits.  *Id.* at 14-24. On June 8, 2011, the ALJ found that Cornish was not disabled and not eligible for Supplemental Security Income Benefits.  *Id.* at 24.

On November 13, 2012, Cornish filed the subject complaint seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).[3]  Both parties have submitted their briefs for consideration by the Court.[4]

### III.   <u>Medical Evidence</u>

On June 26, 2009, Cornish appeared at the LSU Lallie Kemp Hospital complaining of a skin

---

[2]There is a discrepancy between Cornish's educational attainment in the administrative record, and Cornish's actual testimony.  In the former, Cornish is listed as having a 10th grade education (R. Doc. 14-6, p. 7), whereas at the hearing Cornish testified the he had studied in school until the 9th grade.  (R. Doc. 14-7, p. 32).  As this apparent discrepancy is immaterial for disposition of the matter, the Court notes it without further comment.

[3]R. Doc. 1.

[4]R. Docs. 10, 12.

rash and/or lesion on his back.  (R. Doc. 14-7, Tr. 22).  He was prescribed Bactrim[5] and Bactroban.[6]  *Id.* at 24.  On November 25, 2009, Cornish again went to the Lallie Kemp Hospital with complaints of redness and swelling in his lower left leg.  *Id.* at 13.  He was prescribed Bactroban, Bactrim, and Tramadol HCI 50 MCG Oral.[7]  *Id.* at 18.  On November 27, 2009, Cornish returned to the emergency room with complaints of a rash or lesions on his right upper back for four months.

On November 27, 2009, Cornish went to Lallie Kemp Hospital's Emergency room with slightly elevated blood pressure of 175/84.  *Id.*  He complained of having the flu and spider bite.  He denied a past medical history and complained of left leg pain.  He was diagnosed with cellulitis, his wound was clean with Bacitracin and upon discharge his blood pressure was 157/84.  (R. Doc. 14-7, Tr. 194-95.)  He was prescribed Tramadol, Bactrim and Bactroban 2% and released.

In connection with his evaluation, the doctor, Lester Culver, ("Dr. Culver") concluded that he did not believe that his interview with Cornish was valid.  *Id.* at 219-220.  Dr. Culver noted that while Cornish could do certain things, Cornish described that he: "get[s] real depressed," and that he cries daily.  *Id.* at 219-20.  Cornish also admitted to hopelessness "three times out of a week," but admitted to worthlessness "all the time".  *Id.* at 220.  Cornish complained that the psychological difficulties he experienced first began when he was 29, married, and going through a divorce.  *Id.*

On September 23, 2010 Cornish entered Lallie Kemp with complaints of pain in his lower

---

[5]Bactrim is an antibiotic used to treat different types of bacterial infections such as urinary tract infections, middle ear infections, bronchitis, intestinal infections, pneumonia, and traveler's diarrhea.  *See* PDR Health, *Bactrim*, http://www.pdrhealth.com/drugs/bactrim (last visited Aug. 20, 2013).

[6]Bactroban is an antibacterial agent produced by fermentation using the organism Pseudomonas fluorescens.  It is active against a wide range of gram-positive bacteria including methicillin-resistant Staphylococcus aureus (MRSA).  It is also active against certain gram-negative bacteria. Mupirocin inhibits bacterial protein synthesis by reversibly and specifically binding to bacterial isoleucyl transfer-RNA synthetase.  *See* Drugs.com, *Bactroban Ointment*, http://www.drugs.com/pro/bactroban-ointment.html (last visited Aug. 20 2013).

[7]Tramadol is a narcotic-like pain reliever. Tramadol is used to treat moderate to severe pain. Tramadol extended-release is used to treat moderate to severe chronic pain when treatment is needed around the clock.  *See* MedlinePlus, *Tramadol*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (last visited Aug. 20, 2013).

back and depression.  He was diagnosed with ringworm, obesity, and chronic high blood pressure.

**IV.**    **Social Security Administration Evaluations**

    **A.**    **Lester Culver, Ph.D.**

During Cornish's physiological evaluation, conducted on May 31, 2010, Lester Culver, Ph.D. ("Dr. Culver") found that the interview was invalidated because Ms. Williams underestimated his abilities at times.  (R. Doc. 14-7, Tr. 219.)  During behavior testing, Dr. Culver noted that Cornish was a casually dressed black male with normal posture and clean clothes.  Dr. Culver reported that Cornish had no unusual motor behavior present and no evidence of hyperactivity.  (R. Doc. 14-7, Tr. 222.)  His eye contact was good, he was motivated and cooperative.  *Id.*    According to Dr. Culver, Cornish worked a sufficient time on all questions, which suggested adequate motivation.  Also, Dr. Culver noted that his affect was euthymic and that he was able to follow simple commands.  *Id.*   His voice was of adequate volume and his vocabulary was adequate for communication during the interview; his speech was goal-directed and there was no evidence of any disorder.  *Id.*

Dr. Culver concluded that Cornish was a man of borderline intelligence.  He reported that he did not find any evidence to support a DSM-IV diagnosis, and that Cornish was able to sustain attention for one hour and would be able to do simple repetitive tasks for two hour blocks of time. *Id.* at 222.  Dr. Culver noted that Cornish's effort and persistence was adequate and that he had no difficulty relating to him.  Cornish was also able to tolerate the testing process, and would be able to deal with the stress that is commonly associated with most jobs.  *Id.*

    **B.**    **David D. Clark, Ed.D.**

Psychologist David D. Clark, Ed.D. ("Dr. Clark") prepared the report on a Mental Status Examination and a Wechsler Adult Intelligence Scale-IV ("WAIS-IV") assessment of Cornish on

March 16, 2010.  (R. Doc. 14-7, Tr. 259-61.)  The exam was conducted by "L. Gibson."  *Id.*  During the exam, Cornish alleged that he had difficulty thinking and felt depressed.  It was noted that Cornish attended the interview with Robin Williams, who was his fiancé of six years, as well as a friend who provided transportation.  *Id.*  Cornish told the examiner that he paid the friend twenty dollars to bring him to the examination.  *Id.*

The examiner noted that Cornish had a valid Louisiana driver's license dated August 8, 2008, indicating that he was five foot eleven and weighed two hundred sixty-five pounds.  *Id.*  It was noted that Cornish was able to give his birth date and Social Security number.  He stated that he did not have a cell phone.  Also, upon presentation of the disclaimer, Cornish indicated that he was unable to read it, which required the disclaimer to be read to him.  *Id.*

When Cornish presented himself for examination, the evaluator observed that his clothing was quite dirty and that he had not bathed in several days.  *Id.*  Cornish was noted as highly cooperative, ingratiating, and nervous during the interview.  *Id.*  Cornish also indicated that he was not on any medication, but that he had high blood pressure. He also stated that his back hurt and that he suffered from trouble sleeping.  *Id.*

Cornish reported that he attended school through tenth grade in a special class.  He stated that he left high school at the age of seventeen.  *Id.*  He reported an employment history of working in the field picking cucumbers because he could not get a good job, and that people teased him because of his limitations.  *Id.*  He indicated also that he worked at a feed mill, but was let go because he did not perform well on the job.  He reported that he did not work on that job for longer than six months.  *Id.*

He further stated that he was last employed three years ago, when he was employed operating a forklift.  He was released from this job after only two months because he could not read labels, nor decipher one case from another.  *Id.* at 260.  According to Cornish he made his income

from picking up cans on the side of the road.  *Id.*  He reported that his fiancé helped him complete his employment applications.

Cornish stated that he lives in a trailer, receives food stamps and some financial assistance from his brother.  He reported that he has a child and is subject to a support order for which the judge threatened to send him to jail, and which he has attempted to purge by paying $268.00 for the past three months.  *Id.*

Dr. Clark concluded Cornish had neither a mental health history nor any drug history.  In regard to his mental status, his intelligence was tested by means of the WAIS-IV.  Dr. Clark concluded that he was malingering, and it was quite clear that he was attempting to appear less competent than he is in fact.  *Id.*  Dr. Clark concluded that his functioning was consistent within the "Mentally Retarded Mild Educable" range of ability, as represented by a full Scale IQ of fifty-seven (57) which is at slightly less than the first percentile.  *Id.*

Dr. Clark concluded that Cornish's IQ is an accurate assessment of his cognitive skills, although he appears to function having borderline abilities, he falls within the borderline range because he has a vehicle and is able to partially support himself in a minimal fashion.  *Id.*  According to Dr. Clark, Cornish appears to be illiterate, with quite limited ability, but has motivation to produce some income.  *Id.*

Dr. Clark noted that Cornish had some difficulty with proper orientation although he was able to get the month and year right.  *Id.*  His assessment of immediate and delay recall for simple material was satisfactory, however, he did have difficulty with recall after several minutes.  His thought processes were noted as appropriate to Borderline Intelligence, as he appeared quite able to stay with the interview, and he had no difficulty adapting to circumstances. *Id.*  His thought content was unremarkable, and his affect and mood was euthymic.  He indicated that he was not capable of handling funds himself and that if he qualified for assistance, "the check" should go to

his fiancé.  Dr. Clark diagnosed him in Axis I with an Academic Problem (special education, drop out, illiterate) with an inability to hold a job.  In Axis II he was diagnosed with Borderline Intellectual Functioning and an IQ of 57.  Dr. Clark did not place an entry in the Axis III diagnosis. *Id.*

### C.   Lawrence Guidry, Ph.D.

On June 1, 2010, a Mental Residual Functional Capacity ("RFC") Assessment was conducted of Cornish by Lawrence Guidry, Ph.D. ("Dr. Guidry").  (R. Doc. 14-7, Tr. 226-44.)  He evaluated Cornish in the area of understanding and memory which consisted of his ability to remember locations, work-like procedures, and very short, simple instructions.  Dr. Guidry found that Cornish's impairment in this area was not significantly limited but markedly limited in his ability to understand and remember detailed instructions.  *Id.* at 227, 241.

Dr. Guidry also evaluated Cornish in the area of sustained concentration and persistence, which consisted of assessing Cornish's ability to carry out very short, simple instructions; his attention and concentration for extended periods; his activities within a schedule; and his ability to maintain regular attendance and be punctual within customary tolerances.  *Id.*  It also included the ability to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, and to make simple work-related decision. *Id.*

Dr. Guidry concluded that in each of these areas there was no significant limitation. However, in the area of understanding, remembering and carrying out detailed instructions, Cornish was markedly limited.  Cornish had limited ability in completing a normal workday and workweek without interruptions from psychologically based symptoms, such that he could not perform at a consistent pace without taking an unreasonable amount of rest periods.  *Id.*

In the area of social interaction, Cornish was evaluated for his ability to interact

appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  In this subcategory, Dr. Guidry concluded that Cornish was not significantly limited.  *Id.* at 228.

Finally, in the area of adaptation, Cornish was evaluated with the ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation and set realistic goals or make plans independently of others.  *Id.*  In this area, Dr. Guidry concluded that Cornish was moderately limited in the area of his ability to respond appropriately to change in the work setting and in the ability to travel in unfamiliar places or use public transportation.  *Id.*  Dr. Guidry also concluded that there was credible limitation in Cornish's mental functioning, but that it did not amount a "mental listing."  *Id.* at 229.

### D.    Psychiatric Review Technique Form

On June 10, 2010, Dr. Guidry also completed a psychiatric review technique form which indicated that an RFC assessment was necessary, and that the medical disposition was based upon Organic Mental Disorders 12.02.  *Id.* at 232.  Dr. Guidry further found that a medically determinable impairment was present but that it did not precisely satisfy the diagnostic criteria.  *Id.*

Dr. Guidry rated Cornish's functional limitations of activities of daily living as moderate, maintaining social function as mild, and maintaining concentration persistence or pace as moderate without episodes of decompensation of an extended duration.  Dr. Guidry further concluded that there was not evidence of any medically documented history of chronic organic, schizophrenic or affective disorder history.  *Id.* at 242.

     **E.**    **Anthony Hasse, M.D.**

Anthony Hasse, M.D. ("Dr. Haase") conducted a disability determination of Cornish on August 14, 2010. He noted that Cornish complained of difficulty thinking, depression, high blood pressure and back problems. He further noted that Cornish complained of depression with increased "depressed feelings since the 5th grade" which he stated stemmed from people making fun of and teasing him about his learning difficulties. (R. Doc. 14-7, Tr. 246.) He told Dr. Haase that three weeks earlier he cut his wrists with the intention of killing himself, but was bandaged up by his mother who found him shortly after this attempt. He noted that afterwards, he did not go to the hospital. (R. Doc. 14-7, Tr. 246.)

After conducting a physical examination of Cornish, Dr. Haase concluded that Cornish suffered from depression, hypertension and lumbago. (R. Doc. 14-7, 249.) He concluded that his gait and station were within normal limits. However, Cornish advised the doctor that he constantly had suicidal and homicidal ideations, but has never followed up with counseling; nor has he ever been on any type of antidepressant or hospitalized. *Id.*

     **F.**    **Rosenblum Mental Health Center**

On September 16, 2010, Cornish went to the Rosenblum Mental Health Center of Hammond, Louisiana ("Rosenblum Mental Health Center") where he reported that he suffers from depression and has had thoughts of killing himself. (R. Doc. 14-7, Tr. 264-92.) He stated that about two hours prior to his arrival he had "become worse" and that he was unable to sleep. *Id.* at 264. He also stated that he stays away from people so that he does not potentially hurt people. *Id.* He reported that talking in the woods was helpful, and that the animals told him to hurt himself. *Id.* He also reported that he hears voices. *Id.*

Cornish also "reported ideas of reference which anger[] him and make[] him want to fight." *Id.* He further stated that he was working, but his supervisor and fellow employees teased him about

his inability to read or write.  He told the evaluator that he went to the social security office, and was sent to a psychiatrist who told him to come back if things got worse.

The evaluator assessed him as a casually dressed, poorly groomed male, with a moderately bad odor.  *Id.*  His affect was labile, and he was not immediately suicidal, but frequently had thoughts and plans of harming others.  He was also assessed as fairly logical and goal directed with some delusional material, although he had limited judgment and impulse control.  He was diagnosed with Schizoaffective Disorder, High Blood Pressure, Financial Stressors, and a GAF of 58.  *Id.*

Cornish was admitted to the clinic.  *Id.*  He was prescribed Risperdal[8] and Celexa[9] *Id.*  He treated with the clinic September 29, 2010 through February 21, 2011.  *See id.* at 284.

### G.   Mental Residual Functional Capacity

Dr. Sharon Hoffman ("Dr. Hoffman") evaluated Cornish's social interaction concerning his inability to accept instruction from, or respond appropriately to, criticism from supervisors as marked.  (R. Doc. 14-7, Tr. 299-302.)  Dr. Hoffman found that his inability to work in coordination with, or in proximity, to others without distracting them or exhibiting behavioral extremes as marked; his inability to respond appropriately to co-workers or peers was extreme; he was unable to relate to general public and maintain socially appropriate behavior.  *Id.* at 299-301.

In the area of sustained concentration and persistence, Cornish was noted as suffering from a marked inability to perform and complete work tasks in a normal work day or week at a consistent pace, in cooperation with or in proximity to others without being distracted by them, and also in his

---

[8]Risperdal is an antipsychotic medication, which is used to treat schizophrenia and symptoms of bipolar disorder (manic depression).  *See* Drugs.com, *Risperdal*, http://www.drugs.com/search.php?searchterm=Risperdal (Last visited August 22, 2013).

[9]Celexa (citalopram) is an antidepressant in a group of drugs called selective serotonin re-uptake inhibitors (SSRIs).  Celexa is used to treat depression.  *See* Drugs.com, *Celexa*, http://www.drugs.com/celexa.html (last visited July 20, 2013).

ability to process subjective information accurately and use proper judgment.  *Id.*  He also was noted as markedly impaired in his ability to carry through instructions and complete tasks and perform at production levels expected by most employees.  Finally he was noted as extremely impaired in his ability to maintain attention and concentration for more than brief periods of time.  *Id.*

Cornish was also assessed as markedly impaired in his ability to respond appropriately to changes in the work setting, to remember locations, workday procedures and instructions, and in his ability to tolerate customary work pressures.  *Id.*  Finally, he was assessed as moderately impaired in his ability to be aware of normal hazards and take necessary precautions, as well as mildly impaired in his ability to maintain personal appearance and hygiene.  He was also assessed as extremely impaired in his ability to behave predictably, reliably and in an emotionally stable manner.  *Id.*  The doctor concluded that his condition likely would deteriorate if he was placed under stress, particularly of the job.  He was capable of managing his own funds and it was concluded that his impairment would or was expected to last for 12 months or more.  *Id.*

### H.   <u>Administrative Hearing Testimony</u>

During the Administrative Hearing held on June 1, 2011, Cornish testified that he was thirty-nine-years-old, that he completed the ninth grade, and had no vocational training.  (R. Doc. 14-2, Administrative Hearing, Tr. 31).  He further testified that his mailing address was P.O. Box 575, and that he lived in a mobile home.  *Id.*  He testified that he last worked seasonally at Ike's Feed Mill where he hauled hay, fixed fence rows, and worked with fertilizer.  *Id.* at 32.  He testified that he stopped working there because he was informed he was not needed any longer because he did not finish "things" and would "forget a lot."  *Id.*

He testified that he tried driving a fork-lift, but because of his limited reading ability, he could not read labels and frequently messed things up.  Cornish stated that because of this, he was let go after about three months.  *Id.* at 32-33.  He also testified that he worked at a candy factory

where he performed maintenance work for approximately three months, until they found out that he could not read. He testified that he had difficulty putting "the machines" together. He also testified that he has trouble being around people, and believes that people are always talking about him. *Id.* at 34. He testified that he receives medicine from a clinic which helps him because he hears voices. While he testified that he takes the medicine which he has been prescribed, he also testified that he hears voices despite the medicine. *Id.*

He denied visiting his family and friends but acknowledged that he does go to church. *Id.* at 35. He denied watching TV for more than 10 minutes a day, and also denied having hobbies. He acknowledged that he does have a drivers license and that he also drives. *Id.* He testified that his medicine makes him ill and that he has experienced suicidal feelings, but did not go to the hospital because of his fear of doctors and needles. He confirmed to the doctor that he felt useless because he could not see his son. *Id.* He denied having problems walking, standing, sitting, but indicated that he does have trouble following instructions and getting along with others. *Id.* at 37. He testified that he sees a social worker at Rosenblum Mental Health Center and also that he sees Dr. Hoffman. *Id.* at 41.

I.    **Vocational Expert**

The vocational expert, Todd Paquilano, ("Paquilano") testified that Cornish worked as a forklift operator, which is classified as "medium unskilled", and as a farmhand, which is "heavy unskilled." *Id.* at 42. He also testified that Cornish worked as a plant picker, also a "medium unskilled" job. *Id.*

Paquilano testified that Cornish can work as a farmhand and as a plant picker because these jobs are within the category of employment which can be performed by a similar person with the same age, education and vocational experience, subject to limited contact with coworkers during one-third of the day. (R. Doc. 14-2, Tr. 42.) Subject to questioning by counsel, Paquilano testified

12

that if a person with the same limitations of Cornish also had a weak "foundation," which includes difficulty following instruction, performing activity within a regular basis, maintaining attendance, and maintaining a regular work schedule, such a person would be markedly limited, and would not be able to maintain employment. *Id.* at 45.

Counsel thereafter questioned Paquilano regarding whether an individual who has no ability to respond appropriately to coworkers, maintain socially appropriate behavior, keep attention focused for more than brief periods of time, behave reliably, predictably and in an emotionally stable manner with marked limitations in following instructions, would be able to work. *Id.* at 46. Paquilano testified that subject to the hypothetical posed, the individual would not be able to work.

## V.      Findings of the Administrative Law Judge

On June 8, 2011, the ALJ issued a decision denying Cornish's protectively filed Title II application for a period of disability and disability insurance benefits. (R. Doc. 14-2, Tr. 14.) The ALJ found that Cornish's schizoaffective disorder imposes more than minimal limitations on his ability to perform work-related activities and thus is "severe" within the meaning of the social security act and regulations. *Id.* at 16. The ALJ further found that Cornish's mental impairment does not meet or medically equal the criteria of listing 12.03, and in doing so, she noted that she considered the criteria in paragraph B which provides that the mental impairment must result in at least two of the following: marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of duration. A marked limitation means more than moderate but less than extreme. *Id.* at 17.

The ALJ further notes that she considered the criteria of paragraph C and concluded that the evidence failed to establish the presence of paragraph C criteria. *Id.* at 17-18. The ALJ further noted that in making the finding, she considered all symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence. According to the

ALJ, in considering the claimant's medically determinable impairment could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statement concerning the intensity, persistence and limiting effects of these symptoms was not credible to the extent they are inconsistent with the RFC Assessment.  *Id.* at 20.

The ALJ further found that it did not find the claimant's statements regarding the severity of his impairment, and the degree of his limitations fully credible.  *Id.*  The ALJ noted that the claimant alleged that he did not receive any mental health treatment from the onset date of October 1, 2008, until September 2010.  Such lack of treatment strongly indicates that his symptoms were not as severe as he alleged.  The ALJ further noted that Cornish had shown improvement since commencing treatment and taking medication.  She further noted that after only seven months, the social worker at Rosenblum Mental Health Center reported that he was doing well.  His thought process was logical and his speech was within normal limits.  *Id.*  The ALJ further credited Cornish's testimony to the extent consistent with the ability to perform work of a simple, routine nature with no public contact and limited contact with co-workers.  *Id.* at 21.  The ALJ found that Cornish is capable of performing his past relevant work as a farm hand and plant picker, which would not be precluded by his residual functional capacity.  *Id.* at 21.  The ALJ further concluded that Cornish has not been under a disability as defined in the Social Security Act from October 1, 2008 through the date of the ALJ decision.

## VI.   <u>Standard of Review</u>

The role of this Court on judicial review under Title 42 U.S. C. § 405(g) is to determine whether there is substantial evidence in the record to support the determination of the fact finder. The Court may not re-weigh the evidence, try issues *de novo*, or substitute its judgement for that of the Secretary.  *Allen v. Schweitker*, 642 F.2d 799, 800 (5th Cir. 1981).  Review of the Secretary's

decision is limited to "whether [her] findings are supported by substantial evidence in the record and whether [she] applied the correct legal standards." *Emory v. Sullivan*, 936 F.2d 1092, 1093 (10th Cir. 1991). An ALJ's failure to apply the correct legal test constitutes a ground for reversal. *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

Substantial evidence is more than a scintilla and less than a preponderance, and is considered relevant such that a reasonable mind might accept it as adequate to support a conclusion. *See Richardson v Perales*, 402 U.S. 389, 401 (1971). It must do more than create a suspicion of the existence of the fact to be established, but no "substantial evidence" will be found where there is only a "conspicuous absence of credible choices" or "contrary medical evidence." *See Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973); *Hemphill v. Weinberger*, 483 F.2d 1137, 1138 (5th Cir. 1973).

The concept of disability is defined in the Social Security Act, as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). Section § 423(d)(3) of the Act further defines "physical or mental impairment" as "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.*

In determining whether a claimant is capable of engaging in any substantial gainful activity, the Secretary applies a five-step sequential evaluation process. The Regulations governing the steps of this evaluation process are: (1) a claimant who is working and engaging in a substantial gainful activity will not be found to be disabled no matter what the medical findings are; (2) a claimant will

not be found to be disabled unless he has a "severe impairment"; (3) a claimant whose impairment meets or is equivalent to an impairment listed in Appendix 1 of the regulations will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled"; and (5) if a claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity must be considered to determine whether he can do any work that exists in the national economy. *See Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).

For mental impairments, an additional regulatory process supplements the five-step process detailed above. *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). It requires the hearing officer to record the pertinent signs, symptoms, findings, functional limitations and effects of treatment contained in the case record in order to determine if a mental impairment exists. *Id.* If an impairment is found the examiner must analyze whether certain medical findings relevant to a claimant's ability to work are present or absent. *Id.* The examiner must then rate the degree of functional loss resulting from the impairment in certain areas deemed essential for work. *Id.*[10]

In determining whether a potential claimant is disabled, medical opinions from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments will always be considered. 20 C.F.R. § 404.1527. If the record contains a medical opinion from a treating physician on the nature and severity of the claimant's

---

[10]20 C.F.R. § 404.1520a(c) provides for the examination of the degree of functional loss in four areas of function considered essential to work. These areas of activities are: daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* The degree of limitation in the first three functional areas are rated on a scale that ranges from no limitation to severe. *Id.* The degree of limitation in the fourth functional area (episodes of decompensation), is rated on the following four-point scale: none, one or two, three, four or more. *Id.*

impairments, the Commissioner's Regulations dictate that it must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." 20 C.F.R. § 404.1527(c)(2); *see also Frey v. Brown*, 816 F.2d 508, 513 (10th Cir. 1987).

The Regulations provide that the ALJ will make a determination based on the available evidence if all evidence received by the ALJ, including medical opinions, is consistent. 20 C.F.R. § 404.1527(c)(4). The Regulations also contain a general rule that greater weight should be given to the medical opinions of treating sources because they are "more likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's medical impairments. 20 C.F.R. § 404.1527(c)(2). However, if a medical opinion issued by a treating physician is not given controlling weight because it is not well-supported or inconsistent with evidence in the record, then the Court will determine the appropriate weight to give the opinion based on a list of factors found in 20 C.F.R. § 404.1527(d).

In determining how much weight to give a treating physician's report, the ALJ must consider six enumerated factors: (1) the length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence in support of the medical opinion; (4) the consistency of the medical opinions reflected in the record as a whole; (5) whether the medical provider is a specialist in the area in which he renders his opinions; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

Based on the examination of the aforementioned factors, the ALJ must decide how much weight to give the treating physician's opinion. If the results from multiple factors suggest that the treating physician's opinion should be more closely considered despite its inconsistency or lack of

support in the record, great weight should be given to it. *See Mosca v. Massanari*, 2002 WL 511522, at *7 (D. Mass. Jan. 30, 2002). In all situations, the Secretary must give specific, legitimate reasons if the ALJ's decision disregards the treating physician's opinion that a claimant is disabled. *See Williams v. Bowen*, 844 F.2d 748, 758 (10th Cir. 1988).

If the ALJ does not discuss or apply the factors listed in 20 C.F.R. § 404.1527(d), the Court may remand the case for re-evaluation if the ALJ assigned more weight to a non-treating source opinion than to the treating physician's medical opinion of the claimant. *Mosca,* 2002 WL 511522, at *7; *see also Baker v. Brown*, 886 F.2d 289, 291 (10th Cir. 1989). In situations where the treating physician's opinion is not given controlling weight, the ALJ must also explain the amount of weight he has assigned to the opinions of State agency medical and psychological consultants. 20 C.F.R. § 404.1527(d)(2).

## VII.   <u>Analysis</u>

The plaintiff contends that despite the regulatory definition of "severe impairment" as one that significantly limits his ability to perform basic work activities, the ALJ failed to conclude that Cornish's Borderline Intellectual Functioning is a severe impairment as defined in Section 12.05(c) of the listing level impairment. The defendant, on the other hand, contends that the only valid medical evidence of Borderline Intellectual Functioning were diagnoses by state agency consultative examiners, Dr. Culver and Dr. Clark, who also opined that Cornish was able to sustain attention, maintain adequate effort and persistence, and perform simple, repetitive tasks.

Borderline Intellectual Functioning is a cognitive impairment that applies to people who have lower than average intelligence but do not have intellectual developmental disorder or mental retardation. Borderline Intellectual Functioning is diagnosed by IQ test scores that are between 71

and 84.  People with Borderline Intellectual Functioning typically have difficulties with learning, reasoning, planning, abstract thinking, and judgment.  Lower than average intellectual functioning can be caused by birth injury, fetal alcohol syndrome, environmental exposure to toxins such as lead, infections, or genetics.[11]

An applicant with Borderline Intellectual Functioning who does not qualify for disability through the mental retardation listing may nonetheless be able to qualify for disability benefits by proving that his or her impairments make it impossible to find full-time work.  An applicant's mental limitations  are assessed to come up with the applicant's "residual functional capacity," or "RFC." The RFC is then used to determine whether there are any jobs the applicant can do despite his or her limitations. A mental RFC includes non-exertional limitations, such as the following:

**Following instructions.**  Applicants with borderline intellectual functioning may have a limited ability to understand, remember, and carry out complex instructions. They may require that tasks be broken into individual steps that can be completed one at a time, rather than being given a series of instructions that must be remembered and followed one after another.

**Supervision and training.**  The need for close supervision and/or an extended training period is another, related limitation. A person with borderline intellectual functioning may not be able to do any of the jobs that don't provide much support from supervisors.

**Concentration.**  People with borderline intellectual functioning may also have limited ability to concentrate and focus. They may need to avoid multitasking, or doing several things at once. As a result, they may be limited to jobs that involve only simple, routine tasks. Evidence of difficulties with concentration may be found in work evaluations that show frequent errors.

**"Pace"** is another workplace limitation that may apply to someone with borderline intellectual functioning. Someone who needs extra time to perform tasks may not be able to do certain jobs, such as assembly-line work.

**Judgment.**  Because people with borderline intellectual functioning often have impaired judgment and reasoning ability, they may have a limited ability to make

---

[11]*See* My Healthy Feeling, *Borderline Intellectual Functioning*, http://www.myhealthyfeeling.com/borderline-intellectual-functioning/ (last visited July 21, 2013).

judgments on complex work-related decisions. This is another potential workplace limitation that should be included in the applicant's RFC, if applicable.

**Social functioning.** Borderline intellectual functioning often causes difficulties with social functioning and communication. Someone with this condition may be unsuited to jobs that involve dealing with customers. This should be reflected in the RFC as a limitation in contact with the general public.

Anne Fitzpatrick, *Does Borderline Intellectual Functioning Qualify Someone for Disability Benefits?*, Disabilitysecrets.com, http://www.disabilitysecrets.com/resources/social-security-disability-coverage/borderline-intellectual-functioning-benefits.htm (last visited July 21, 2013); *see* 20 C.F.R. § 141.1520. In general, Borderline Intellectual Functioning by itself is not enough to be found disabled under the Social Security Act. But in combination with other mental or physical impairments, Borderline Intellectual Functioning can qualify someone for disability benefits.

The ALJ concluded that Cornish did not meet the listing level requirement for 12.03 schizophrenic, paranoid and other psychotic disorders, finding that he did not meet the requirements of section B in at least two of the restriction areas. She noted that in activities of daily living that Cornish was mildly restricted because he reported that he could cut grass, cook and shop with a family member. (R. Doc. 14-2, Tr. 17.) He had marked difficulties in social functioning because he preferred to be by himself but was able to attend church weekly. In the area of concentration, persistence or pace, he had moderate limitations. *Id.*

In reaching this conclusion, the ALJ relied upon the evaluation of Dr. Culver, who found that Cornish was able to sustain attention on the day of the evaluation for one hour and that his history suggested that he would be able to perform simple, repetitive tasks for two hour blocks of time. *Id.* The ALJ further noted that Cornish had not experienced any episodes of decompensation which lasted for an extended duration. *Id.*

The record shows however that Cornish was diagnosed with Borderline Intellectual

Functioning (BIF) by state agency consultants Dr. Culver, Dr. Clark, and Dr. Guidry.  He was also

diagnosed with schizoaffective disorder by Louis Dedon of the Rosenblum Mental Health Center.

*See* (R. Doc. 14-7, Tr. 222-23, 227-29, 264.)  The BIF finding also shows that Cornish according

to Dr. Guidry was markedly limited in his ability to understand and remember detailed instructions

and in his ability to carry out detailed instructions.  (R. Doc. 14-7, Tr. 227.)

      The ALJ adopted Dr. Guidry's opinion evidence, noting that it was consistent with the record

as a whole.  (R. Doc. 14-2, p. 22).  However, in doing so she adopted the marked limitation in his

sustained concentration and persistence or ability to carry out detailed instructions.  (R. Doc. 14-7,

Tr. 227.)  Given that the record shows that Cornish was diagnosed with Schizoaffective Disorder

by the clinic doctor he was seeing, and Borderline Intellectual Functioning by the state doctors some

three months earlier, and the fact that the ALJ only considered the Schizoaffective diagnosis which

was the last diagnosis made, these different diagnosis should be reconciled or jointly assessed.

However, once there was a change in his diagnosis the ALJ did not require an updated Mental RFC

Assessment or a Psychiatric Review Technique, but rejected the treating physicians attempt to assess

his limitations based upon the limitations evident in the record from earlier assessments.

      Further, contrary to the finding of the ALJ, Dr. Guidry found Cornish markedly limited not

mildly limited in concentration, persistence and pace in the RFC Assessment on June 1, 2010.  As

a result, the Court finds that the ALJ erred and the matter is remanded for further consideration of

all of the evidence in the record.

## VIII.   <u>Recommendation</u>

      Accordingly,

      It is **RECOMMENDED** that the ALJ's decision denying Sylvester Cornish's Disability

Benefits and Supplemental Security Income Benefits be **REVERSED AND REMAND** for further consideration of the record.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United States Auto Ass`n*, 79 F. 3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this 3rd day of October 2013.

_____
    **KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**